THE STATE EX REL. JACKSON TUBE SERVICES, INC., APPELLANT,
*v.* INDUSTRIAL COMMISSION OF OHIO ET AL., APPELLEES.

[Cite as *State ex rel. Jackson Tube Serv., Inc. v. Indus. Comm.*, 99 Ohio St.3d 1, 2003-Ohio-2259.]

(No. 2002–0603—Submitted April 15, 2003—Decided May 7, 2003.)

**Per Curiam.**

{¶ 1}  Appellee-claimant James R. Alexander's workers' compensation claim was allowed for a torn left rotator cuff and other injuries.  In May 1998, Dr. Don D. Delcamp performed an open surgery on the shoulder and repaired two tears. Temporary total disability compensation ("TTC") was paid thereafter.

{¶ 2}  Despite the operation, claimant continued to have significant shoulder problems.  Dr. Steven S. Wunder examined claimant on behalf of appellant-employer, Jackson Tube Services, Inc. ("JTS"), and opined that claimant had reached maximum medical improvement.  Appellee Industrial Commission of Ohio terminated TTC based on that report.

{¶ 3}  On May 26, 2000, claimant sought to change doctors and get further treatment.  Claimant submitted office notes and reports from Dr. Jonathan J. Paley.  In his March 29, 2000 entry, Dr. Paley offered a preliminary diagnosis of "1. Left shoulder rotator tear. 2. Left shoulder subacromial impingement. 3. Left shoulder AC joint traumatic degeneration. 4. Cervical spine strain."  He further proposed:

{¶ 4}·  "I feel that this gentleman's problems all stem from his 1999 work injury * * *.  Since he never had a shoulder arthroscopy performed, I feel that substantial pathology is still being missed in the form of either a glenoid labral tear, an intra-articular flap tear of the delaminating variety and possibly even a full thickness rotator cuff tear.  The Bigliano curve that is present is indicative of considerable impingement.  The AC joint also is very symptomatic in this individual and is also undoubtedly a cause of his discomfort and failure of the shoulder procedure to provide the relief that is expected.

{¶ 5}  "I feel that this individual will only improve after he has had a proper shoulder procedure performed.  I would recommend first a video arthroscopy to

delineate the exact cause of the intra-articular problem and to look at the biceps tendon, intra-articular cuff and the glenoid labrum. Further, I would recommend proceeding with either an open rotator cuff repair should the cuff be torn or also proceeding with the subacromial decompression and distal clavicle excision to be done arthroscopically. I have discussed these things with the patient at length. The patient feels that he may well require an attorney to get the needed conditions allowed. I have no problems being supportive of him as I feel that this problem is directly attributable to his left shoulder rotator cuff. BY NO MEANS IS THIS INDIVIDUAL MAXIMALLY MEDICALLY IMPROVED. HE REQUIRES CONSIDERABLE SURGICAL WORK TO BE DONE ON HIS LEFT SHOULDER AND SHOULD IMPROVE ONCE THIS IS COMPLETED." (Emphasis sic.)

{¶ 6} In a June 8, 2000 letter, Dr. Paley additionally reported:

{¶ 7} "It is well documented in the radiology and orthopaedic literature that MRI's are notorious for missing shoulder pathology. This especially pertains to the glenoid labrum. As a matter of fact more often times than not, a glenoid labral tear will be missed, but yet it is this very same structure that can be incapacitating and cause further disability until it is treated surgically.

{¶ 8} "Without question I feel that this individual's problems are directly attributable to his work related problems. It should further be noted that this individual's surgery was preformed [sic] in an open fashion and not without [sic] an arthroscopy. It is a well accepted fact that considerable and substantial shoulder pathology will be missed without properly arthroscoping the shoulder first prior to an open rotator cuff procedure."

{¶ 9} Approximately two weeks later, claimant moved for surgical authorization and TTC. JTS objected, asserting that two of the four conditions that Dr. Paley diagnosed were not allowed in the claim. Claimant responded that without surgery, there was no way to definitively identify the conditions that were causing his problems. Apparently the possibility of authorizing surgery for inspection and diagnosis—but without any treatment—was presented. Dr. Paley quickly disavowed that possibility:

{¶ 10} "Without question, I feel that Mr. Alexander has suffered more extensive injury as a result of his fall injuring his left shoulder. As a general rule, when a patient has a left shoulder rotator cuff tear, there is always additional pathology such as damage to the acromial clavicular (AC joint), as well as sometimes to the glenoid labrum. These are all things that can be treated and taken care of at the same time as the torn rotator cuff. His radiographs are consistent with a left shoulder subacromial impingement which, in fact, causes rotator cuff tear when he fell landing on his shoulder. Had he not fallen injuring the shoulder, then chances are he would never have experienced problems with that involved extremity.

{¶ 11} "As a physician I cannot simply do a diagnostic arthroscopy and not treat the underlying pathology while arthroscoping the shoulder joint. This is unethical and would place the patient at additional risk for potential complications such as an infection, a pulmonary embolus, reflex empathetic [sic] dystrophy, prolonged recovery, etc. It would further subjugate [sic] him to a second arthroscopic procedure which would necessitate further anesthesia which is not without some risk in and of itself.

{¶ 12} "This is why the diagnostic arthroscopy should be performed but, at the same time, the appropriate treatment should be instituted for this problem. I expect to find that he probably will have some glenoid labral pathology; however, this will not add anything further to the cost of the surgery since the treatment of the rotator cuff tear in and of itself includes taking care of the glenoid labrum. I am simply trying to delineate all of the conditions this individual has for future record."

{¶ 13} A district hearing officer denied claimant's motion in its entirety, citing the nonallowed conditions. A staff hearing officer vacated that order, writing:

{¶ 14} "Claimant's request for authorization and payment for medical services for the treatment of the allowed conditions is granted. Further, the Hearing Officer finds that Dr. Paley's request for authorization and payment for arthroscopic surgery on the left shoulder for diagnostic purposes is appropriate and necessary for the treatment of the claimant's left shoulder. Therefore, the arthroscopic procedure is authorized and payment is ordered.

{¶ 15} "Claimant's request for the payment of temporary total disability compensation from 5–1–00 to 8–01–00 is denied. Claimant's condition was found to have reached maximum medical improvement as of 4–20–00. There is no evidence of any new or changed circumstances which would reinstate temporary total disability compensation. However, it is the finding of the Staff Hearing Officer that beginning on the date of the arthroscopic surgery and continuing for a usual and customary recuperative period, temporary total disability compensation is to be paid upon submission of appropriate medical evidence.

{¶ 16} "This order is based upon the medical reports of Dr. Paley (6–8–00, 7–28–00) * * *."

{¶ 17} Further appeal was refused. JTS responded on June 8, 2001, with a complaint in mandamus in the Court of Appeals for Franklin County.

{¶ 18} Claimant had undergone arthroscopic surgery on November 20, 2000. Dr. Paley's postoperative diagnosis was similar to his preoperative, namely "Left shoulder rotator cuff tear. Subacromial impingement. Traumatic degeneration of distal clavicle." Claimant, however, continued to have severe pain and discomfort, which Dr. Paley then attributed to a large defect in the deltoid

muscle. This prompted Dr. Paley on February 26, 2001, to proceed without bureau authorization and perform an open repair of the deltoid. Relief was still elusive, and Dr. Paley commented on April 3, 2001, that claimant then had symptoms "consistent with a cervical disc."

{¶ 19} On February 2, 2002, the court of appeals issued its decision. Applying *State ex rel. Miller v. Indus. Comm.* (1994), 71 Ohio St.3d 229, 643 N.E.2d 113, the court determined that the surgery and TTC were causally related to the industrial injury and affirmed the commission's order.

{¶ 20} This cause is now before this court upon appeal as of right.

{¶ 21} The sincerity of claimant's continued left shoulder complaints after Dr. Delcamp's operation is unassailed. Dr. Paley offered several possible causes, tying them all to claimant's industrial accident. Only one of these conditions, however, was allowed in the claim when surgery was authorized, prompting JTS's challenge to both the surgical authorization and the TTC it believes it was ordered to pay.

{¶ 22} This is a difficult issue. On one hand, claimant could not move for additional allowance beforehand, since without the surgery, the problematic conditions could not be identified. On the other hand, self-insured JTS questions its recourse when ordered to pay for surgery that ultimately reveals any conditions to be nonindustrial. It also fears that payment could be interpreted as an implicit allowance of all of the conditions in the postoperative diagnosis.

{¶ 23} The court of appeals relied on *Miller*, which adopted a tripartite test for authorization of medical services: "(1) are the medical services 'reasonably related to the industrial injury, that is the allowed conditions'? (2) are the services 'reasonably necessary for treatment of the industrial injury'? and (3) is 'the cost of such service[s] * * * medically reasonable?'" Id. at 232, 643 N.E.2d 113, quoting *State ex rel. Noland v. Indus. Comm.* (Aug. 27, 1987), Franklin App. No. 86AP-594, 1987 WL 16171.

{¶ 24} JTS argues that *Miller* does not excuse additional allowance of conditions before surgery where the conditions are specific and can be assigned to a particular body part. It describes *Miller* as carving only a limited exception for those conditions unamenable to allowance because of their generalized nature—Miller's overall obesity, for example.

{¶ 25} All agree that *Miller* was never intended to permit an employee to circumvent additional allowance by simply asserting a relationship to the original injury. The problem in this case, however, is that because any conditions are internal, claimant could not know what conditions to seek additional allowance for without first getting the diagnosis that only surgery could provide.

{¶ 26} *Miller* is not squarely on point, but it articulates a sound test that is instructive. The three cases offered by JTS, moreover—*State ex rel. Bradley v. Indus. Comm.* (1997), 77 Ohio St.3d 239, 673 N.E.2d 1275, *State ex rel. Griffith v. Indus. Comm.* (1999), 87 Ohio St.3d 154, 718 N.E.2d 423, and *State ex rel. Meridia Hillcrest Hosp. v. Indus. Comm.* (1995), 74 Ohio St.3d 39, 656 N.E.2d 336—deal primarily with nonallowed conditions and TTC, not medical treatment. *Griffith* actually hurts JTS's cause, noting that "the existence of a contributing nonallowed condition is not a legitimate reason for refusing to pay for medical treatment independently required for an allowed condition." Id. at 156, 718 N.E.2d 423. Here, Dr. Paley has always listed the allowed condition of torn rotator cuff as requiring surgery, despite whatever other potential conditions were contemplated. Accordingly, the commission did not abuse its discretion in applying *Miller* and authorizing surgery.

{¶ 27} As to TTC, the parties initially debate the presence of a specific payment directive, given the order's vague wording. Assuming that payment has indeed been ordered, the question from claimant's perspective is uncomplicated. Surgery was approved as related to the industrial injury, making, he argues, compensability automatic.

{¶ 28} Claimant's position overlooks the fact that only one of Dr. Paley's surgeries was preauthorized. It also does not take into account that with each procedure, Dr. Paley opined that something new was wrong. What started as an attempt to amend a generalized description of injury has turned into something much bigger.

{¶ 29} This underscores the need for formal recognition of any newly identified conditions that are indeed related to the injury. As we have consistently declared, TTC can never be based—even in part—on nonallowed conditions. See *State ex rel. Waddle v. Indus. Comm.* (1993), 67 Ohio St.3d 452, 619 N.E.2d 1018.

{¶ 30} Accordingly, that portion of the court of appeals' judgment upholding surgical authorization is affirmed. The order to pay TTC is reversed, and the cause is returned to the commission for further consideration of the relationship between disability and the conditions that might now be allowed in the claim.

Judgment accordingly.

MOYER, C.J., PFEIFER, COOK, LUNDBERG STRATTON and O'CONNOR, JJ., concur.

RESNICK and F.E. SWEENEY, JJ., dissent and would affirm the court of appeals in toto.

---

Pickrel, Schaeffer & Ebeling, R. Joseph Wessendarp, David C. Korte and Michelle D. Bach, for appellant.

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■
■■■■■■■■■■

Jim Petro, Attorney General, and Erica L. Bass, Assistant Attorney General, for appellee Industrial Commission.

Casper & Casper and Megan Richards, for appellee James R. Alexander.